IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:23-cr-00081 |
| | ) | |
| HUNTER G. MELLO, | ) | |
| | ) | |
| Defendant. | ) | |

# **DEFENDANT'S SENTENCING POSITION AND REQUEST FOR DOWNWARD VARIANCE**

COMES NOW, Hunter G. Mello ("Mello"), by counsel, and hereby states that he has received and reviewed the Presentence Report ("PSR") prepared in this case. The PSR reflects that Mello has a total offense level of 28 and a Criminal History Category I, yielding an advisory guideline range of 78 to 97 months. He has no objections to the PSR. For the reasons stated by the United States, which are hereby adopted and supplemented, Mello respectfully requests that the Court vary from the suggested guideline range and impose a sentence of no more than 61 months incarceration. Such a sentence is warranted due to the unique facts of this case, to includes Mello's immediate acceptance of responsibility, extensive cooperation with the government and the impact of his substance use struggles, all in accordance with the Title 18 U.S.C. § 3553(a) factors that follow. The requested sentence is appropriate, as it is sufficient but not greater than necessary to reflect the objectives of Title 18 U.S.C. § 3553(a).

## **Argument**

### ***The Sentencing Factors Under Section 3553(a) Support the Imposition of a Sentence of 65 Months or Less***

Section 3553(a) requires a sentencing court to consider the nature and circumstances of the

offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendants with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and the need to provide restitution to any victims of the offense.

Courts may impose a variance outside of the guideline range after consideration of all relevant departure provisions. *Gall v. United States*, 552 U.S. 38, 49 (2007). Variances preserve a district court's ultimate ability to impose a sentence that it views is "sufficient, but not greater than necessary." *See* 18 U.S.C. § 3553(a). As will be described in greater detail below, Mello has taken extraordinary efforts accept responsibility for his actions and to make amends.

***The Nature and Circumstances of the Offense***

Mello pled guilty to Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1349 and 1343. From 2017 to 2020, Mello engaged in a "tech-support" fraud scheme in which users would receive a "pop up" notification that usually locked their computers and displayed a message directing the individual to contact a toll-free number for technical assistance. In the scheme, one company would publish the "pop up" notifications directing victims to contact a call center. The call center would then provide "tech support" to unlock the user's computer for a fee. Mello was a middleman, connecting the company publishing the "pop ups" with the foreign call centers. Mello had no contact with the victims nor did he initially have access to the text of the "pop ups" or the communications between the call center and the victim. Nonetheless, he came to know the conduct was unlawful and continued his middleman role, resulting in this conviction.

In 2020, Mello left California and moved to Florida where he was approached by law enforcement regarding this tech-support scheme. He immediately retained counsel and made a

voluntary proffer in which he did not minimize his role and demonstrated a genuine desire to accept responsibility and make amends as best he could. Mello also waived indictment and voluntarily entered a guilty plea, saving the United States from further investigation or seeking an indictment from a grand jury. For more than five years thereafter, he has had no infractions or arrests and has worked tirelessly to rehabilitate and improve himself.

***The History and Characteristics of Hunter Mello***

Mello's childhood was unstable. While he was raised by both parents, his parents went through multiple periods of separation before divorcing when Mello was in high school. During this time, the family lived in Tampa, Florida; Miami, Florida; and Massachusetts. His father also frequently traveled for work. Fortunately, despite challenging home life, Mello has maintained a close relationship with both parents as well as his stepmother. Mello also has two siblings and two half-siblings. He began drinking and using marijuana at age 16.

After graduating high school in 2002, Mello enrolled in Lynn University in Boca Raton, Florida. However, he withdrew after his first year. Mello began experimenting with drugs and alcohol around this time. From there, he progressed to cocaine, methamphetamines, opiates, ecstasy, hallucinogens, and Xanax. In 2003, around the time he dropped out of Lynn University, he received treatment at an outpatient facility but did not complete the program.

Unfortunately, he did not grow out of his drug habit. Instead, his substance use intensified. By 2015, when he moved from Florida to California, his drug use worsened and was abusing substances heavily. Mello succumbed to what he thought was the Los Angeles party scene and abused drugs, often "partying" four to five times a week. This consistent partying and drug use clouded his judgment and contributed to series of poor decisions, some of which bring him before this Court.

While in Los Angeles and supporting his habit, Mello became involved in the underlying

fraud scheme. After moving to California, Mello was hired by a performance marketing agency, a "pay per call" company that specialized in generating legitimate telephone calls and leads for businesses. Mello worked on several legitimate projects, such as generating calls for health insurance companies, when he was approached with the tech support scheme. In many ways, the tech support scheme resembled his other legitimate projects. To him, the scheme felt like a regular job; although, Mello did believe that this specific project was a "gray area." In fact, he was told as much by the person who presented him with the opportunity.

As the scheme went on, he began to realize that it was not a grey area and was morally and legally wrong. He did not withdraw from the scheme, ultimately bringing him into contact with law enforcement. In 2020, during the height of lockdown and the isolation he felt, Mello moved to Florida for several months. It was during this time that he was first contacted by law enforcement. In the following months, Mello decided that he needed to turn his life around. He quit his position with the performance market agency, moved to Massachusetts, and took employment as a bar back at a restaurant. Mello found Massachusetts to be calmer, and he was closer to his family. This environment led Mello to get sober, initially by quitting the "harder" drugs and reducing the frequency of alcohol and marijuana consumption. In 2023, Mello decided to stop using any type of drug, alcohol, or nicotine and to be fully sober. He will address the Court regarding that decision and sobriety's impact on him and his family. He has remained sober ever since.

Mello also started attending therapy. As part of his sobriety journey, Mello found a sense of purpose. At first, he took volunteer positions cooking meals for a hospice house several times a week and then as a youth basketball coach. Later, he found purpose through exercise. He spent hours in the gym and the studied and obtained a personal training certificate. Equipped with the certificate, he obtained a job as a personal trainer at a local gym. Mello enjoys this profession because he gets to actively help others and watch them grow. While Mello would not wish his experience on

anyone, he acknowledges that the process of being charged and convicted has brought him opportunities for growth. He was first contacted by agents in 2020. In the next five years, he transformed himself from a man seeking money, drugs, and alcohol to a man that is sober and seeks to help others.

Aside from traffic violations that occurred twenty-five years ago when Mello was a minor, he has no prior criminal record. Since he was initially contacted and after three years of federal supervision, he's had no infractions. As discussed above, Mello is currently employed as a bartender and a personal trainer. Both employers are aware of his conviction, and both employers are willing to rehire him after any period of incarceration.

Mello feels an immense amount of guilt for his actions and wants to right his wrongs. He looks forward to addressing the Court and expressing both his contrition and his laudable rehabilitation and restitution efforts.

***The Need for the Sentence Imposed***

Under 18 U.S.C. § 3553(a)(2), a sentencing court must consider the need for the sentence imposed to: (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (B) afford adequate deterrence to criminal conduct; (C) protect the public from future crimes by this defendant; and (D) provide the defendant with educational or vocational training, medical care, or other corrective treatment.

There is a "broad judicial consensus" that "Section 2B1.1's loss table overstates culpability in a great many cases."[1] "Especially as the loss amount increases into the millions, the sentences recommended by the loss table are widely viewed as unduly severe, increasingly arbitrary, and

---

[1] Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio ST. J. of Crim. L. 605, 618 (2021).

manifestly disproportionate to the non-violent nature of the underlying economic crimes."[2] Given that the sentencing guidelines already overstate the appropriate punishment for fraud offenders, a sentence a the low end of the guidelines adequately reflects the seriousness of the offense.

A sentence at the low end of the guidelines would provide adequate deterrence. The simple fact of receiving a felony conviction will provide deterrence independent of the amount of incarceration he receives. The conviction will have a serious and long-lasting effect on Mello and his personal and professional standing. Further, even the Department of Justice has acknowledged that it is the *certainty* of being punished that is more impactful than the length of incarceration at deterring future crimes.[3] Longer sentences do not deter others from committing crimes, as "criminals know little about the sanctions for specific crimes."[4] General deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid."[5] Similarly, longer sentences do not deter repeat offenses and may actually make an individual more likely to reoffend as incarcerated individuals become desensitized to the threat of future incarceration.[6]

The requested sentence will not endanger the public. First, the offense was non-violent. Second, the recidivism rate for all first-time fraud offenders is just 9.3%, the lowest of any offense category.[7] Third, studies have shown that periods of incarceration beyond a year have minimal effects on recidivism. A 2016 study determined that while there was an increasing effect of time served on recidivism for sentences of one year or less, there was a decreasing effect of time served for sentences of 13-24 months and no effect for sentences between 25-60 months.[8] Fourth, and

---

[2] *Id.* at 619.
[3] *Five Things About Deterrence*, National Institute of Justice (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf.
[4] *Id.*
[5] Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1205 (2014) (footnotes omitted).
[6] *Five Things About Deterence*, at 1-2.
[7] *United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 30 (May 2004).
[8] Daniel P. Mears *et al.*, *Recidivism and Time Served in Prison*, 106 J. Crim. L. & Criminology 83, 119 (2016).

perhaps most importantly, Mello deeply regrets his involvement in the tech support fraud scheme and is determined to live the rest of his life as a law-abiding citizen.

Due to his history of substance use, Mello is interested in any available substance use treatment programs offered by BOP. Mello is also interested in educational programs, as he has not completed an undergraduate degree, and vocational programs. Mello intends to use any period of incarceration he receives to better himself and to set himself up for success after release.

***The Kinds of Sentences Available***

Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 14 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

***Unwarranted Sentencing Disparities***

Under 18 U.S.C. § 3553(a)(6), a sentencing court must consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. "During the past five years, there have been 163 defendant's whose primary guideline was §2B1.1, with a Final Offense Level of 28 and a Criminal History Category of

I[.]"[9] The average sentence was 61 months of incarceration, and the median sentence was 60 months.[10] As such, even a sentence of 65 months would be disproportionately long compared to other similar offenders.

***Need for Restitution***

The Court must also consider the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a)(7). Mello understands the need to provide restitution to the victims of the offense and has a plan to do so. As previously discussed, his two employers have informed him that they will rehire him after incarceration. He also intends to make a substantial payment towards his restitution obligation at his sentencing hearing. We ask the Court to not impose a fine so that any monies can be directed to restitution and to satisfy the Consent Order of Forfeiture.

**Conclusion**

For the reasons stated, Mello respectfully requests that this Court and impose a sentence not to exceed 51 months, equivalent to a reduction of two offense levels.

Respectfully submitted,

**HUNTER G. MELLO**

By: /s/ Charles E. James, Jr.
Charles E. James, Jr. (VSB No. 46310)
John A. Irvin (VSB No. 97044)
WILLIAMS MULLEN, P.C.
200 South 10th Street, Suite 1600
Richmond, VA 23219
Office: 804.420.6529
Fax: 804.420.6507
Email: cjames@williamsmullen.com
jirvin@williamsmullen.com

[9] *Judiciary Sentencing INformation (JSIN)*, United States Sentencing Commission (last accessed Jan. 14, 2026), https://jsin.ussc.gov/analytics/saw.dll?Dashboard.
[10] *Id.*

/s/ Wes J. Camden
Wes J. Camden
NC State Bar No. 33190
301 Fayetteville Street, Suite 1700 (27601)
PO Box 1000
Raleigh, NC 27602
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
Email: wcamden@williamsmullen.com

*Attorneys for Hunter G. Mello*

**CERTIFICATION**

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;
2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 3rd day of February, 2026.

/s/ Wes J. Camden
Wes J. Camden
NC State Bar No. 33190
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
wcamden@williamsmullen.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of February, 2026, I have electronically filed the foregoing with the Clerk of Court using CM/ECF system which will then send a notification of such filing (NEF) to the following:

Matthew Thomas Warren
227 West Trade Street, Ste 1650
Charlotte, NC 28202
704-338-3111
Matthew.warren@usdoj.gov

Benjamin Bain-Creed
227 West Trade Street
Charlotte, NC 28202
704-338-3123
Benjamin.Bain-Creed@usdoj.gov

/s/ Wes J. Camden
Wes J. Camden
NC State Bar No. 33190
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
wcamden@williamsmullen.com